UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

_____

UNITED STATES OF AMERICA,                  CR 22-40096

                              Plaintiff,    MEMORANDUM IN OPPOSITION
                                            TO DEFENDANT'S MOTION TO
            vs.                             DISMISS

NEW SUDAN OMOT OKELLO,

                              Defendant.

_____

The United States of America through its attorneys, Alison J. Ramsdell, United States Attorney, and Paige Petersen, Special Assistant United States Attorney, submits this brief in opposition to defendant New Sudan Omot Okello's (Okello) motion to dismiss the indictment. Doc 28. The defendant's motion and supporting brief contends 18 U.S.C. § 922(g)(3) is unconstitutional in light of the United States Supreme Court's ruling in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). *Id.* The defendant also claims 18 U.S.C. § 922(g)(3) is unconstitutionally vague, both facially and as applied. *Id.*

A.    **Background**

On August 27, 2022, Sioux Falls Police Officers conducted a traffic stop on a 2011 red Toyota Venza (WGLH9) after another Officer observed a subject he knew to be New Okello inside the vehicle. Officers at the time knew Okello had an active warrant. As law enforcement approached the vehicle and ordered everyone to put their hands in the air, they observed one of Okello's hands reaching down while he maneuvered in his seat. Okello and the three other

passengers in the vehicle were subsequently asked to exit the vehicle and were questioned by law enforcement.

During the stop, officers became aware that Okello had a nationwide extradition warrant out of Iowa for a probation violation regarding his Class D Felony - Possession of a Controlled Substance: Intent to Deliver False Marijuana. Okello also had other warrants out of Minnehaha County for speeding and driving without a valid license.

A search of the vehicle then took place which revealed a stolen firearm (Glock 42 .380 bearing SN: AFHC217) under the seat where Okello was previously sitting. Okello later waived his Miranda Rights and agreed to speak with officers on scene. Okello admitted to officers that the stolen gun was his and that he bought it off someone for $400 two days prior. Officers asked Okello about the scent of marijuana radiating from him and Okello admitted he had recently smoked marijuana—just 5 minutes prior to the traffic stop—and was still high. He further stated he "smokes almost every hour of every day." Okello further advised that he is on probation out of Iowa for a prior felony marijuana charge out of Buena Vista.

On September 15, 2022, Okello provided a urine sample. The sample was tested by a forensic chemist with the South Dakota Public Health Laboratory. The test results confirmed Okello had THC in his system.

Okello was indicted by a federal grand jury in August of 2022 and charged with Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. §

922(g)(3), which prohibits unlawful users of controlled substances from possessing firearms, and 18 U.S.C. § 924(a)(2). Doc. 1.

**B.     Section 922(g)(3) is Constitutional**

The Second Amendment to the Constitution protects "the right of the people to keep and bear Arms." U.S. Const. amend. II. In recent years, the Supreme Court has developed a framework to analyze Second Amendment challenges. In *District of Columbia v. Heller*, after a lengthy textual and historical analysis, the Supreme Court concluded that the Second Amendment protects the right of law-abiding, responsible citizens to possess a handgun in the home for lawful purposes, like self-defense. 554 U.S. 570, 576–635 (2008).[1] But "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626. Indeed, the Supreme Court cautioned that nothing in *Heller* "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* These restrictions, the Supreme Court explained, were a non-exhaustive list of "presumptively lawful regulatory measures." *Id.* at 627 n.26.

Most recently, in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, the Supreme Court considered whether a New York law that required individuals prove "proper cause exist[ed]" to carry a firearm in public comported with the

---

[1] In *McDonald v. Chicago*, 561 U.S. 742 (2010), the Supreme Court held that this right applies to the states through the Fourteenth Amendment.

Second Amendment. 142 S. Ct. 2111, 2122–23 (2022). Before discussing the merits of the case, the Court observed that since its decision in *Heller*, the Courts of Appeals had widely adopted a "two-step" framework to determine whether a firearm regulation violated the Second Amendment. *Id.* at 2126; *see e.g., United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013). Under that two-part analysis, the lower courts' inquiry "(1) ask[ed] whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, direct[ed] courts to apply an appropriate level of scrutiny"—ranging from intermediate to strict scrutiny. *Chovan*, 735 F.3d at 1136–38.

The Supreme Court approved of the first step of this analysis as being "consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Bruen*, 142 S. Ct. at 2128. But the *Bruen* majority rejected the second step of the Court of Appeals' post-*Heller* framework, despite its popularity. *Id.* It explained that Heller expressly declined to apply means-end scrutiny to firearm regulations and that courts "must assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2129–31. When applying the analysis articulated in *Bruen*, a court must first consider whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2129–30. If so, then "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

Like *Heller*, *Bruen* repeatedly described the Second Amendment right as belonging to "law-abiding, responsible" citizens. *Heller*, 554 U.S. at 635; *Bruen*,

4

142 S.Ct. at 2131, 2138 n.9, 2156. And the Court in *Heller* said that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," measures the Court said were non-exhaustive examples of "presumptively lawful regulatory measures." *Heller*, 554 U.S. at 626 & n.26. And *Bruen* did not back away from this part of *Heller*. Justice Alito explained in concurrence that *Bruen* did not "disturb[ ] anything that [the Court] said in *Heller* or *McDonald* … about restrictions that may be imposed on the possession or carrying of guns." *Bruen,* 142 S.Ct. at 2157 (Alito. J., concurring). And Justice Kavanaugh (joined by the Chief Justice) emphasized that "the Second Amendment allows a 'variety' of gun regulations" and reiterated *Heller* and *McDonald*'s reassurances that the decisions did not "cast doubt on" numerous such regulations, including "longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* at 2162 (Kavanaugh, J., concurring) (internal quotation marks and citation omitted). As explained in more detail below, unlawful users of controlled substances are *per se* not law-abiding, and the prohibition on their firearm possession is analogous to longstanding restrictions on firearm possession by felons and the mentally ill.

  **1. Possession of firearms by unlawful users of controlled substances is not protected by the plain text of the Second Amendment**

  The Supreme Court has explained that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever

purpose." *Heller*, 554 U.S. at 626. Although *Heller* did not purport to give an "exhaustive" list, it indicated that the Second Amendment does not forbid "presumptively lawful regulatory measures," such as "long-standing prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27 & n.26.

*Heller* defined the right to bear arms as belonging to "law-abiding, responsible" citizens. *Heller*, 554 U.S. at 635. And *Bruen* echoed that definition, stating no fewer than fourteen times that the Second Amendment protects the rights of "law-abiding" citizens. *Bruen*, 142 S.Ct. at 2122, 2125, 2131, 2133, 2134, 2138, 2150, 2156.

A person like Okello who violates § 922(g)(3) is, by definition, not a law-abiding, responsible citizen. Section 922(g)(3) only applies to a person who "is an unlawful user of or addicted to any controlled substance." For § 922(g)(3)'s prohibition to apply, the government must "demonstrate use of a controlled substance 'during the period of time' that the defendant possessed firearms." *United States v. Carnes*, 22 F.4th 743, 748 (8th Cir. 2022). In other words, "§ 922's 'unlawful user' element [ ] require[s] a temporal nexus between the proscribed act (for § 922(g)(3), possession of a firearm) and regular drug use." *Id.* An unlawful, current, and regular user of a federally controlled substance can hardly be termed "law-abiding" or "responsible." *Bruen*, 142 S.Ct. at 2131.

6

Such unlawful users of intoxicating substances known to cause impairment of the ability to safely handle firearms are neither law-abiding nor responsible.

Indeed, *Bruen* endorsed the "shall issue" license-to-carry provisions of 43 states, a number of which, including South Dakota and many other states in the Eighth Circuit, specifically exclude those who unlawfully use or are addicted to controlled substances. *See, e.g.*, SDCL §§ 23-7-7 and 23-7-7.1; NDCC § 62.1-04-03; Iowa Code Ann. §§ 724.7 and 724.8; Miss. Code. Ann. § 45- 9-101(e); Tex. Gov't Code Ann. § 411.172(a)(6); Ohio Rev. Code § 2923.125(o); Ark. Code § 5-73-309(7)(A). *Bruen* explained that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes." *Bruen*, 142 S.Ct. at 2138 n.9. The Court said those regimes, "which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* And Justice Kavanaugh, joined by the Chief Justice, explicitly said that such "shall-issue licensing regimes are constitutionally permissible." *Id.* at 2162 (Kavanaugh, J., concurring). *Bruen*'s endorsement of those licensing schemes would make little sense if the Second Amendment in fact prevented states from disarming unlawful users of controlled substances.

Okello does not appear to seriously contend he was a law-abiding, responsible citizen at the time of his conduct. Docket 28. Certainly, Okello's statements to law enforcement during his traffic stop where he admitted to "smoking [marijuana] every hour of every day," purchasing a stolen handgun,

and getting "high" 5 minutes before he was pulled over rebuts any claim he was a "law-abiding, responsible citizen." An 8th Circuit District Court Judge out of the Western Division of South Dakota has previously found that individuals who are abusing illegal drugs are not "law-abiding citizen[s]." *See United States v. Bruce*, 2016 WL 3580636, *3, 5:15CR50153-JLV (D.S.D. 2016) ("The court finds § 922(g)(3) as applied to Mr. Bruce is a constitutionally valid restriction on his right to possess a firearm while a drug abuser. While abusing illegal drugs, Mr. Bruce is not a law-abiding citizen and is not entitled to possess a firearm in 'defense of hearth and home.'") (citations omitted).

In an effort to argue his criminal conduct is covered by the Second Amendment, Okello relies on *District of Columbia v. Heller*, 554 U.S. 570 (2008). However, in *United States v. Rahimi*, 2023 WL 2317796, 4-5 (5th Cir. 2023), the panel explained, "*Heller*'s reference to 'law-abiding, responsible citizens' meant to exclude from the Court's discussions groups that have historically been stripped of their Second Amendment rights, i.e., groups whose disarmament the Founders *'presumptively'* tolerated or would have tolerated" (emphasis added) (quoting *Bruen*, 554 U.S. at 627 n.26). The panel opinion further explained that Rahimi did not fit into any of those groups because his domestic violence restraining order was entered in a civil proceeding and he was only "suspected" of other criminal conduct. *Id.* at *5. *See also id.* at *15 (Ho, J., concurring) (expressing concern that "18 U.S.C. § 922(g)(8) disarms individuals based on civil protective orders—not criminal proceedings"). Understood in context, this Court's references to "law-abiding" and "responsible" citizens exclude those who

have committed serious crimes (such as felonies or dangerous misdemeanors) and who are irresponsible *in relation to gun possession* (such as minors or the mentally ill). *See Heller*, 554 U.S. at 625-26; *Bruen*, 142 S.Ct. at 2138 n.9. Individuals who commit ongoing criminal violations cannot be classified as "law-abiding" or "responsible." Whatever the Second Amendment implications for other offenses, the continuing conduct required to qualify as an "unlawful user" of a controlled substance surely removes the perpetrator from the class of law-abiding, responsible citizens.[2]

### 2. Section 922(g)(3) is consistent with the historical laws that kept firearms away from lawbreakers and untrustworthy or potentially dangerous persons

Even if § 922(g)(3) is deemed to burden the rights of "law-abiding, responsible citizens," it nevertheless passes constitutional muster because it is consistent with the Nation's historical tradition of firearm regulation. Courts overwhelmingly have rejected Second Amendment challenges to § 922(g)(3), both before and after *Bruen*.[3] And although some circuit decisions applied the means-

---

[2] Post *Bruen*, recent South Dakota District Court and Eighth Circuit opinions reinforce the position that individual involved in ongoing criminal behavior are not considered "law-abiding, responsible citizens" for purposes of the Second Amendment. *See United States v. Sitladeen*, --- 4th ---, 2023 WL 2765015, *5 (8th Cir. 2023) (holding that "unlawful aliens are not part of 'the people' to whom the protections of the Second Amendment extend"); *United States v. Hoeft*, 2023 WL 2586030, *3, 4:21CR40163-KES (D.S.D. March 21, 2023) ("Those convicted of domestic violence are not the 'law-abiding citizens' that *Bruen* meant to protect.").

[3] Post-*Bruen* there have been two District Court rulings rejecting the constitutionality of 922(g)(3). See *United States v. Connelly*, No. 3:22-cr-229 out of the Western District of Texas and *United States v. Harrison*, No. 5:22-cr-328 out of the Western District of Oklahoma. Both are pending appeal in their respective Circuits.

ends test *Bruen* eschewed, *see, e.g.*, *United States v. Carter*, 669 F.3d 411, 414 (4th Cir. 2012), others—including the Eighth and Ninth Circuits—rest on the analogy between Section 922(g)(3) and the "longstanding prohibitions" that *Heller* endorsed, 554 U.S. at 626, and on which six Justices in *Bruen* took pains not to cast doubt. *See, e.g.*, 142 S.Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring); *see United States v. Seay*, 620 F.3d 919, 925 (8th Cir. 2010) (noting "922(g)(3) has the same historical pedigree as other portions of § 922(g)" and finding "that 922(g)(3) is the type of 'longstanding prohibition [ ] on the possession of firearms' that *Heller* declared presumptively lawful); *United States v. Dugan*, 637 F.3d 998, 999 (9th Cir. 2011) (holding that "like career criminals and the mentally ill," regular drug users "more likely will have difficulty exercising self-control, particularly when they are under the influence of controlled substances").

Consistent with these authorities, twelve district courts that have confronted challenges to Section 922(g)(3) after *Bruen*, have rejected them.[4] The lone outlier, proceeded primarily not by distinguishing § 922(g)(3) from the

---

[4] *See United States v. Beverly*, No. 2:21cr36 (N.D.W.Va. Jan. 3, 2003); *United States v. Black*, —F.Supp.3d—2023 WL 122920 (W.D. La. Jan. 6, 2023); *United States v. Kelley*, No. 5:22cr395 (W.D. Okla. Jan. 13, 2023); *United States v. Lewis*, 2023 WL 187582 (W.D. Okla. Jan. 13, 2023); *United States v. Posey*, 2023 WL 1869095 (N.D. Ind. Feb. 9, 2023); *United States v. Sanchez*, 2022 WL 17815116 (W.D. Tex. Dec. 19, 2022); *United States v. Seiwert*, 2022 WL 4534605 (N.D. Ill. Sept. 28, 2022); *United States v. Stennerson*, 2023 WL 2214351 (D. Mont. Feb. 24, 2023); *United States v. Veasley*, No. 4:20cr209 (S.D. Iowa Sept. 22, 2022); *United State v. Randall*, No. 4:22cr99 (S.D. Iowa, February 14, 2023); *United States v. Daniels*, 610 F. Supp.3d 892 (S.D. Miss., July 8, 2022); *Fried v. Garland*, No. 4:22cv164 (N.D. Fla. November 4, 2022); see *also State v. Wilfong*, 881 S.E. 2d 426, 429 (W. Va. 2022).

longstanding prohibition disqualifying felons, but by questioning the constitutionality of that prohibition as well, *see United States v. Harrison*, 2023 WL 1771138 (W.D. Ok. Feb. 3, 2023)—a result which no other federal court has embraced, *see United States v. Posey*, 2023 WL 1869095, at *9 n.9 (N.D. Ind. Feb. 9, 2023) (recognizing that *Harrison* represents a "dramatic departure from existing precedent"). Moreover, the historical analogues discussed in detail below clearly demonstrate that § 922(g)(3) is constitutional because it follows this Nation's longstanding tradition of regulating the possession of firearms by individuals deemed sufficiently dangerous.

First, § 922(g)(3)'s prohibition on firearm possession by unlawful users of controlled substances is analogous to "longstanding prohibitions on the possession of firearms by … the mentally ill" and the intoxicated. *Heller*, 554 U.S. at 626. In England, justices of the peace could lock up dangerous lunatics and seize their property to pay for the cost of securing them. *See The Origin of Insanity as A Special Verdict: The Trial for Treason of James Hadfield (1800)*, 19 LAW & SOC'Y REV. 487 (1985). Similarly, "in eighteenth-century America, justices of the peace were authorized to 'lock up' 'lunatics' who were 'dangerous to be permitted to go abroad.'" *United States v. Yancey*, 621 F.3d 681, 685 (7th Cir. 2010) (citation omitted). As the Third Circuit reasoned in a decision vacated on other grounds, these severe restrictions on the liberty of the mentally ill made any specific restrictions on firearm possession unnecessary at the time. *Beers v. Attorney General of the United States*, 927 F.3d 150, 157 (3d Cir. 2019), *vacated*,

140 S.Ct. 2758 (2020). But, as *Heller* recognized, it was beyond dispute that the mentally ill could be disarmed. 554 U.S. at 626.

Although being under the influence of a controlled substance is not tantamount to mental illness, both conditions can render a person incapable of safely and responsibly possessing a firearm. The Founders placed intoxicated individuals in the same category as the mentally ill, criminals, and others subject to disarmament. Benjamin Rush, a signer of the Declaration of Independence and a prominent physician, equated drunkenness with a "temporary fit of madness." BENJAMIN RUSH, AN INQUIRY INTO THE EFFECTS OF ARDENT SPIRITS ON THE MIND AND BODY, 2 (1784). And other eighteenth-century observers likewise designated "habitual drinking" as a form of "insanity." CARL ERIK FISHER, URGE: OUR HISTORY OF ADDICTION 47 (2022) (citing Roy Porter, *The Drinking Man's Disease: The Pre-history of Alcoholism in Georgian Britain*, 80 BRITISH J. OF ADDICTION 385, 390 (1985)). As the Seventh Circuit has observed, "habitual drug abusers, like the mentally ill, are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms." *Yancey*, 621 F.3d at 685.[5]

Section 922(g)(3) is also analogous to historical laws that prohibited carrying a firearm while under the influence of alcohol. For example, in 1655, Virginia prohibited "shoot[ing] any gunns at drinkeing." 1 Hening, Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the

---

[5] The Seventh Circuit, in *Yancey*, thoroughly explores the legislative history of § 922(g)(3).

Legislature 401-02 (1823). In 1771, New York prohibited firing guns during the New Year's holiday, a restriction that "was aimed at preventing the 'great Damages ... frequently done on [those days] by persons ... being often intoxicated with Liquor.'" *Heller*, 554 U.S. at 632 (quoting Ch. 1501, 5 Colonial Laws of New York 244–46 (1894)). And a 1746 New Jersey statute authorized militia officers to "disarm" any soldier who "appear[ed] in Arms disguised in Liquor." Acts of the General Assembly of the Province of New-Jersey 303 (1752).

Similarly, following ratification of the Fourteenth Amendment in 1868, which extended the Second Amendment to the states, *see McDonald v. City of Chicago*, 561 U.S. 742, 749-50 (2010), many states enacted statutes prohibiting intoxicated persons from possessing, using, or receiving firearms. *See, e.g.*, Kansas Gen. Stat., Crimes & Punishments § 282 (1868); 1878 Miss. Laws 175-76 § 2; 1883 Mo. Laws 76, § 1; 1883 Wis. Sess. Laws 290, Offenses Against Lives and Persons of Individuals, ch. 329 § 3; 1890 Okla. Sess. Laws 495, art. 47, § 4; 1899 S.C. Acts 97, No. 67, § 1; *see also State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886). As an influential Missouri Supreme Court decision explained, these laws comport with the right to bear arms because they mitigate the "mischief" that may result "from an intoxicated person going abroad with fire-arms." *Shelby*, 2 S.W. at 469.

That legislatures retain significant authority to keep firearms out of the hands of intoxicated individuals is further illustrated by historical militia laws. As the Second Amendment's text indicates, the Framers recognized that armed members of the militia must be "well-regulated," U.S. CONST. amend. II, a term

that at the time connoted "discipline," *Heller*, 554 U.S. at 597, and "self-control," MICHAEL WALDMAN, THE SECOND AMENDMENT: A BIOGRAPHY 61 (2014). For that reason, at least one state excluded "common drunkards" from the militia, 1844 R.I. Pub. Laws 503-16, §§ 1, 45, and many others forbade the sale of "any Strong Liquor" near locations where militias mustered and trained.[6] These laws confirm that the Founders perceived the risks created when alcohol and firearms coincide and permitted legislatures substantial latitude to address them.

Drugs other than alcohol were not widely used as intoxicants in the United States until the late nineteenth and early twentieth centuries. *See, e.g.*, David F. Musto, *The American Experience with Stimulants and Opiates*, 2 PERSP. ON CRIME & JUST. 51, 63 (1997-98). Accordingly, prohibitions on controlled substances did not emerge until around the 1880s and the early twentieth century respectively. *See* U.S. Treasury Dep't, STATE LAWS RELATING TO THE CONTROL OF NARCOTIC DRUGS AND THE TREATMENT OF DRUG ADDICTION (1931) 1-9 (describing development of state-level laws); Richard J. Bonnie & Charles H. Whitebread, II, *The Forbidden Fruit and the Tree of Knowledge: An*

---

[6] *See* An Act for Regulating the Militia of the Province of Maryland (1756), available in MILITARY OBLIGATION: THE AMERICAN TRADITION (1947) 93, pt. 5, Maryland; An Act for Establishing a Militia in this Government (1756), available in MILITARY OBLIGATION13, pt 3, Delaware; An Act for better settling and regulating the Militia of this Colony of New-Jersey, for the repelling of Invasions, and Suppressing Insurrections and Rebellions (1746) (§§ 3, 23), available in MILITARY OBLIGATION 25, pt. 8, New Jersey; An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania (1780) (§ XLV and § XLVIII(12)), available in MILITARY OBLIGATION pt. 11, Pennsylvania *see also id.* (excluding "common drunkards" from the militia).

*Inquiry into the Legal History of American Marijuana Prohibition*, 56 VA. L. REV. 971, 985 (1970); *id.* at 1010 (noting Utah passed first state prohibition on cannabis sale or possession in 1915).

As new and often more potent substances proliferated, so too did associated firearms regulations. For example, a Pennsylvania statute established that "[n]o person shall deliver a firearm . . . to one who he has reasonable cause to believe … is a drug addict." 1931 Pa. Laws 499, no. 158, § 8. Following Pennsylvania's lead, jurisdictions across the country—including the Districts of Columbia, Alabama, California, South Dakota, and Washington—all passed laws barring the sale of firearms or pistols to "drug addict[s]." 47 Stat. 652, § 7 (1932) (D.C.). *See* 1936 Ala. Laws 52, no. 82, § 8; 1935 S.D. Sess. Laws 356, ch. 208, § 8; 1935 Wash. Sess. Laws 601, ch. 172, § 8.

In a testament to the strength of this historical tradition, prohibitions on firearms possession by drug users remain prevalent today. In recent times, at least twenty-six states and the District of Columbia "have restricted the right of habitual drug abusers or alcoholics to possess or carry firearms." *Yancey*, 621 F.3d at 684 (collecting examples). Section 922(g)(3) thus stands in stark contrast to the "outlier[]" laws the Supreme Court invalidated in *Bruen* and *Heller*. *Bruen*, 142 S.Ct. at 2156; *see id.* at 2161 (Kavanaugh, J., joined by Roberts, C.J., concurring) (emphasizing the "unusual" nature and "outlier" status of the New York law in *Bruen*); *Heller*, 554 U.S. at 629 (noting that "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban"). Unlike those exceptional laws, § 922(g)(3) reflects a historical tradition

15

that stretches from the Founding to the present, and it therefore comports with the Second Amendment. Although none of the pre-twentieth century historical analogues is a "dead ringer" or "historical *twin*" for 18 U.S.C. § 922(g)(3), *Bruen*, 142 S.Ct. at 2133, they nevertheless show that § 922(g)(3) is "analogous enough" to historical laws "to pass constitutional muster." *Id.*[7]

*Bruen* identified "two metrics" that are relevant to the analogical inquiry—"how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S.Ct. at 2133. *See Rahimi*, 2023 WL 2317796, at *6 ("*how* the challenged law burdens the right to armed self-defense, and *why* the law burdens that right") (emphasis by the Court). Section 922(g)(3) imposes *no* burden on a "law-abiding citizen's" right to self-defense because establishing a violation of that statute requires proof that the defendant has violated the law by possessing a controlled substance. But, even as to lawbreakers, § 922(g)(3) imposes only a temporary ban while the person is regularly using a controlled substance. *See Carnes,* 22 F.4th at 748 (noting the requirement of a temporal nexus between drug use and firearm possession). "[A]n unlawful drug user like [Okello] could regain his right to possess a firearm simply by ending his drug abuse." *Yancey*, 621 F.3d at 686. The statute therefore imposes a burden

---

[7] The Supreme Court in *Bruen,* noted that this analogical reasoning is "neither a regulatory straitjacket nor a regulatory blank check." 142 S.Ct. at 2133. While warning courts to not "uphold every modern law that remotely resembles a historical analogue," the Court also clarified that the Government is only obligated to identify a "historical *analogue,* not a historical *twin.*" *Id.* "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

"comparable" to, or even less severe than, the historical laws discussed above. *Bruen*, 142 S.Ct. at 2133. As for "why" such laws were enacted, the reason such laws existed is the same as for the present law, namely, "to keep firearms out of the hands of presumptively risky people." *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 113 n.6 (1983).

Second, § 922(g)(3) is consistent with the Nation's long historical tradition of disarming individuals deemed untrustworthy, potentially dangerous, or otherwise unfaithful to the rule of law. The historical record demonstrates a long Anglo-American tradition allowing the government to categorically limit the gun rights of untrustworthy or potentially dangerous persons. The Militia Act of 1662 permitted officers of the Crown to "seize all arms in the custody or possession of any person" whom they "judge[d] dangerous to the Peace of the Kingdom." 13 & 14 Car. 2, c.3, § 13. *Rahimi* reads the 1689 English Bill of Rights as "restrict[ing] the Militia Act's reach in order to prevent the kind of politically motivated disarmaments pursued by Charles II and James II." *Rahimi*, 2023 WL 2317796, at *8 (italics omitted).

But, the English Bill of Rights, which was a "predecessor of our Second Amendment," *Heller*, 554 U.S. at 593, did not guarantee an unqualified right. It provided that "Subjects which are Protestants, may have Arms for their Defence *suitable to their Conditions, and as allowed by Law.*" *Id.* (citing 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441) (emphasis added). And the historical scholarship indicates that the English Bill of Rights was not intended to curtail the power to disarm the truly dangerous or disaffected, a practice that continued

17

well after the Glorious Revolution and the adoption of the English Bill of Rights. *See* Patrick J. Charles, *"Arms For Their Defense"?: An Historical, Legal, and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated in McDonald v. City of Chicago*, 57 CLEVE. STATE L. REV. 351, 375-77 (2009) (observing that, during the reign of William and Mary, "the 1662 Militia Act's seizure of arms provision was not only frequently used, but it was also supported by both Houses of Parliament"); Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 NOTRE DAME L. REV. 397, 405-06 (2019) (explaining that the "[u]se of the Militia Act to disarm dangerous and disaffected persons continued unabated" following the Glorious Revolution). In short, the Militia Act of 1662 and the English Bill of Rights evidence a historical tradition of disarming both lawbreakers and those deemed to be dangerous.

This tradition of disarming individuals deemed to be untrustworthy or potentially dangerous carried over into the American colonies. *See United States v. Jimenez-Shilon*, 34 F.4th 1042, 1047 (11th Cir. 2022) (recognizing that during the colonial period certain persons were denied the right to bear arms). Moreover, at the Founding, felony offenders could be punished with the death penalty, *see Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in the judgment), or with forfeiture of one's entire estate. *See* 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 95 (1769); Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 CAL. L. REV. 277, 332 & nn.275-76 (2014). Thus, those who committed serious crimes could be stripped of their

18

right to possess firearms just as they could be stripped of other rights, such as the right to vote, *see Green v. Bd. of Elections of City of N.Y.*, 380 F.2d 445, 450 (2d Cir. 1967), cert. denied, 389 U.S. 1048 (1968), or to serve on a jury. *See* Brian C. Kalt, *The Exclusion of Felons from Jury Service*, 53 AM. UNIV. L. REV. 65, 179 (2003). Some states required firearm forfeiture even for misdemeanor offenses involving unauthorized hunting or misuse of a gun.[8]

The Second Amendment's ratification history also indicates that lawbreakers could be disarmed. In what *Heller* characterized as a "highly influential proposal" and a "Second Amendment precursor," 554 U.S. at 604, a group of Pennsylvania antifederalists advocated an amendment guaranteeing the right to bear arms "*unless* for crimes committed, or real danger of public injury." The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, 1787, *reprinted* in 2 BERNARD SCHWARTZ, THE BILL OF RIGHTS: A DOCUMENTARY HISTORY 662, 665 (1971) (emphasis added). As the D.C. Circuit has observed, this proposal "indicates that criminals, in addition to those who posed a 'real danger' (such as

---

[8] *See* Laws and Ordinances of New Netherlands 138 (1868) (1652 law) (firing a gun within the city of New Amsterdam); 1 Complete Revisal of All the Acts of Assembly, of the Province of North Carolina, Now in Force and Use 446-447 (1773) (1768 law) (hunting by non-freeholders); Acts of the General Assembly of the Province of New-Jersey 344 (1776) (1771 law) (trespassing with a gun by non-residents of the colony); 3 Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807, with the Constitutions of the United States of America, and of the Commonwealth, Prefixed 37-38 n* (1897) (1783 law) (storing a loaded gun within Boston); 1 Private and Special Statutes of the Commonwealth of Massachusetts from the Year 1780 to the Close of the Session of the General Court, Begun and Held on the Last Wednesday in May, A.D. 1805 (1805) (1790 law) (possession of a gun on certain islands without permission).

the mentally ill, perhaps) were proper subjects of disarmament." *Medina v.
Whitaker*, 913 F.3d 152, 158-59 (D.C. Cir. 2019). And although the proposal did
not prevail at the Pennsylvania convention, it was vindicated four years later
through the adoption of the Bill of Rights, eight provisions of which—including
the Second Amendment—echoed a set of amendments first proposed by the
Pennsylvania delegates. 2 SCHWARTZ, THE BILL OF RIGHTS at 628.
"[I]nfluential" proponents of the Second Amendment thus understood the "pre-
existing right" the Amendment codified as permitting legislatures to disarm
individuals who either disrespected the law or who otherwise posed a danger if
armed. *Heller*, 554 U.S. at 604.

American colonies and states also frequently disarmed those who were
deemed dangerous or untrustworthy. During the French and Indian War,
Virginia passed a law disarming Catholics that allowed them to keep their arms
if they swore an oath of allegiance to the King. *See* 7 Statutes at Large; Being a
Collection of All the Laws of Virginia 35-36 (1820) (1756 law). During the
Revolutionary War, Connecticut passed a law providing that any person who
"shall libel or defame" any acts or resolves of the Continental Congress or the
Connecticut General Assembly "made for the defence or security of the rights
and privileges" of the colonies "shall be disarmed and not allowed to have or keep
any arms." Public Records of the Colony of Connecticut 193 (1890) (1775 law).
And, at the recommendation of the Continental Congress, *see* 4 Journals of the
Continental Congress 205 (1906) (resolution of March 14, 1776), at least six
states disarmed the "disaffected" who refused to take an oath of allegiance to

those states.[9] Similarly, in 1900, the Ohio Supreme Court upheld the constitutionality of a law criminalizing a tramp's possession of a firearm. *See State v. Hogan*, 63 Ohio St. 202, 58 N.E. 572 (Ohio 1900). Such acts of disarmament were designed to keep firearms out of the hands of dangerous individuals.

Thus, the "historical evidence" shows that "the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety." *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting). Moreover, the historical disarmament of individuals deemed to be dangerous or risky was implicitly recognized by *Bruen*, 142 S.Ct. at 2152.[10]

Here, § 922(g)(3)'s prohibition on firearm possession applies only to those in violation of the drug laws. Societal risk was a key consideration in Congress's adoption of the statute which was aimed at keeping guns out of the hands of illegal drug users. *See, e.g.,* S. Rep. No. 1097, 1968 U.S. CODE CONG. & AD. NEWS 2112, *2114, 1968 WL 4956 (Leg. Hist.) (the ready availability of firearms

---

[9] *See, e.g.,* 5 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 479 (1886) (1776 law); 7 Records of the Colony of Rhode Island and Providence Plantations, in New England 567 (1776 law); 1 The Public Acts of the General Assembly of North Carolina 231 (1804) (1777 law); 9 Statutes at Large; Being A Collection of All the Laws of Virginia 282 (1821) (1777 law); Rutgers, New Jersey Session Laws Online, Acts of the General Assembly of the State of New-Jersey 90 (1777 law); 9 Statutes at Large of Pennsylvania 348 (1779 law).

[10] *See Bruen*, 142 S.Ct. at 2152 & n.26 (citing General D.E. Sickles's 1886 decree barring any "disorderly person, vagrant, or disturber of peace" from bearing arms).

for "narcotic addicts, mental defectives, ... and others whose possession of firearms is similarly contrary to the public interest ... is a matter of serious national concern") (emphasis added).[11] Accordingly, the burdens imposed by § 922(g)(3) and the referenced historical analogues are "comparably justified." *Bruen*, 142 S.Ct. at 2133.

Just as historical laws disarmed people based on their mental illness, intoxication, their status as lawbreakers or their potential dangerousness justifies disarming individuals who are habitually breaking the law by using mind-altering substances. "Ample academic research confirms the connection between drug use and violent crime." *Yancey*, 621 F.3d at 686-87 (discussing research). And even if some drugs have less significant mind-altering effects than other drugs, Congress was entitled to categorically conclude that those who violate the law by being current regular users of controlled substances cannot be trusted to use firearms in a safe and responsible way. As a district judge for the Western District of Oklahoma recently explained in a case upholding the constitutionality of § 922(g)(3), the statute "is relevantly similar to regulations aimed at preventing dangerous or untrustworthy persons from possessing and using firearms, such as individuals convicted of felonies or suffering from mental illness, or individuals who are intoxicated." *United States v. Lewis*, --- F.Supp.3d

---

[11] As the Supreme Court has concluded: "Congress' intent in enacting [18 U.S.C. § 922(g)] was to keep firearms out of the hands of presumptively risky people." *Dickerson*, 460 U.S. at 113 n.6. *See also Abramski v. United States*, 573 U.S. 169, 172 (2014) (federal firearms laws serve "to prevent guns from falling into the wrong hands" and, pursuant to 18 U.S.C. § 922(g), "certain classes of people—felons, *drug addicts*, and the mentally ill, to list a few—may not purchase or possess any firearm") (emphasis added).

---, 2023 WL 187582, at *4 (W.D. Okla. Jan. 13, 2023) (internal quotations and citations omitted). Because this satisfies the "how" and "why" metrics explicitly set forth in *Bruen*, § 922(g)(3) is "analogous enough" to these historical laws "to pass constitutional muster." 142 S.Ct. at 2133.

**C.**     **Section 922(g)(3) does not violate any procedural due process rights**

Okello claims that § 922(g)(3) violates his procedural due process rights under the Fifth Amendment. Docket 28 at pp. 3-7. Okello also relies on a district court case out of Oklahoma, *Harrison*, which is an outlier, the reasoning of which has not been adopted by other courts. *See United States v. Posey*, 2023 WL 1869095, at *9 n.9 (N.D. Ind. Feb. 9, 2023) (recognizing that *Harrison* represents a "dramatic departure from existing precedent").

Okello ignores Eighth Circuit and Supreme Court precedent, which outlines the elements and knowledge requirement. *See United States v. Carnes*, 22 F.4th 743, 748 (8th Cir. 2022) (explaining that for 922(g)(3)'s prohibition to apply, the government must "demonstrate use of a controlled substance 'during the period of time' that the defendant possessed firearms." In other words, "§ 922's 'unlawful user' element [ ] require[s] a temporal nexus between the proscribed act (for § 922(g)(3), possession of a firearm) and regular drug use."); *Rehaif v. United States*, 139 S.Ct. 2191, 2200 (2019) (holding that "in a prosecution under 18 U.S.C. § 922(g) and 924(a)(2), the Government must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons bared from possessing a firearm"). Okello cannot legitimately claim surprise by his prosecution given his

23

admittance of "smoking [marijuana] every hour of every day," getting high 5 minutes before he was stopped by officers, and possessing a stolen firearm.

**D.    Section 922(g)(3) is not Unconstitutionally Vague, Facially or As Applied**

A criminal statute is unconstitutionally vague in violation of the Fifth Amendment due process clause if it "fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement." *United States v. Turner*, 842 F.3d 602, 604 (8th Cir. 2016) (quoting *Johnson v. United States*, 576 U.S. 591, 594 (2015)). Okello raises both a facial and as-applied vagueness challenge to § 922(g)(3) in his motion to dismiss. Doc. 28 at pp. 4-8. Importantly, Okello completely ignores the historically known dangers of using drugs when he stated that "unlawful drug users or persons addicted to drugs [do] not fall within the Nation's history of firearm regulation of individuals who are dangerous, have a propensity for violence, or are generally 'deviators from legal norms.'" Id. at pp. 15. This Court is not new to the pattern of drug cases involving the illegal use of a firearm, or vise-versa.

"Facial challenges . . . are . . . to be discouraged." *Sabri v. United States*, 541 U.S. 600, 608- 09 (2004). "[F]acial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008). Facial challenges "are best when infrequent" and "are especially to be discouraged" when application of the challenged statute to the case at hand would be

24

constitutional when the facts are eventually developed. *Sabri*, 541 U.S. at 608, 609. Not surprisingly, then, "[a] facial challenge to a legislative Act is the most difficult challenge to mount successfully." *United States v. Salerno*, 481 U.S. 739, 745 (1987).  In the present case, 922(g)(3), a legislative Act, is not so vague as to be constitutionally deficient under Eighth Circuit precedent, either facially or as applied, because this statute gives ordinary people a fair notice of the conduct it punishes.

The general practice, outside of the First Amendment context[12], has been to consider the purported vagueness of a statute in light of the facts of the particular case—i.e., as applied—rather than in the abstract. *See, e.g., Maynard v. Cartwright*, 486 U.S. 356, 361; *United States v. Mazurie*, 419 U.S 544, 550 (1975) ("It is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in light of the facts at hand.").

The Eighth Circuit has held, while a defendant can prevail on a facial challenge without proving that a statute in vague in *all* of its applications, "our case law still requires him to show that the statute is vague as applied to *his* particular conduct." *United States v. Bramer*, 832 F.3d 908, 909 (8th Cir. 2016) (emphasis added) (rejecting defendant's facial challenge because the statute was constitutional as applied to him); *see also United States v. Koech*, 992 F.3d 686, 688-89 (8th Cir. 2021) (explaining that, before addressing the defendant's facial

---

[12] Okello does not claim his challenge to § 922(g)(3) implicates the First Amendment.

challenge, it must first be considered whether the statute is unconstitutionally vague as applied), *cert denied,* - - - U.S. - - - 142 S. Ct. 371 (2021).

The Eighth Circuit has already addressed a facial constitutional challenge to § 922(g)(3) based on the Second Amendment and ultimately found "§ 922(g)(3) [to be] the type of 'longstanding prohibition [ ] on firearms' that *Heller* declared presumptively lawful." *Seay*, 620 F.3d at 925; *see also Gilpin v. United States*, 2023 WL 387049, **3-4 (W.D. Mo. January 3, 2023) (rejecting a claim, post *Bruen*, that § 922(g)(3) is facially unconstitutional based on finding "*Bruen* did not invalidate *Heller* or *Heller's* contemplation that certain citizens should be 'disqualified' from keeping or bearing arms under the Second Amendment" and noting "this Court is bound by Eighth Circuit precedent that holds § 922(g)(3) to be presumptively lawful pursuant to *Heller*").

In considering an applied challenge to § 922(g)(3), the court looks to the defendant's own "particular conduct." *Koech*, 992 F.3d at 688-89; *Bramer*, 832 F.3d at 909-10. In this case, by his own admissions, Okello's conduct makes it very clear that he knew he was a regular and consistent user of marijuana. Okello admitted to consistently smoking marijuana. Indeed, Okello's urinalysis results showed that on September 15, 2022, he had THC in his system. Furthermore, Okello admitted to purchasing and being in possession of a firearm.

Given Okello's own admissions and urine analysis, he cannot legitimately claim he was unaware that he was an "unlawful user" of a "controlled substance" under § 922(g)(3). *See e.g. Bramer*, 832 F.3d at 909 (holding no basis to find §

922(g)(3) unconstitutionally vague as applied to the defendant with defendant's admission that he was an unlawful user of marijuana while in knowing possession of firearms); *see also United States v. Stennerson*, 2023 WL 2214351, **2-3 (D. Mont., February 24, 2023) (finding that defendant's admission of use of methamphetamine was sufficient to put him on notice that he was violating § 922(g)(3) and supported a finding that "§ 922(g)(3) is not unconstitutionally vague as applied"); *United States v. Black*, 2023 WL 122920, **4-5 (W.D. La., January 6, 2023) (rejecting a vagueness claim to § 922(g)(3) and concluding that an "ordinary person would understand that [the defendant's] conduct falls within § 922(g)(3) given defendant's admission to "law enforcement that he regularly used marijuana during the time he possessed a firearm; that he has possessed the firearm for months; and that for the past several years, he had been a daily user of marijuana"); *United States v. Sanchez*, ---F.Supp.3d ---, 2022 WL 17815116, *4 (W.D. TX, December 19, 2022) (rejecting a vagueness challenge to § 922(g)(3) and concluding that "an ordinary person would understand that Defendant's conduct falls within [§ 922(g)(3)]" when there was "an admission from the Defendant that he was in use of a controlled substance at the time he was found in possession of a firearm").

In Okello's case, given his admissions, even an "ordinary person" would understand that Okello's use of marijuana while in possession of firearms established him as an "unlawful user" under § 922(g)(3). *Turner*, 842 F.3d at 604.

**E.    Conclusion**

The Court should deny Okello's motion to dismiss the indictment in all respects. Possession of a firearm by an unlawful user of a controlled substance, such as Okello, is not protected by the plain text of the Second Amendment. Section § 922(g)(3) is consistent with the historical laws, does not violate any procedural due process rights, and is not unconstitutionally vague, facially or as applied.

Dated this 12th day of July, 2023.

ALISON J. RAMSDELL
United States Attorney


_____*/s/ PAIGE PETERSEN*_____
Paige Petersen
Special Assistant United States Attorney
P.O. Box 2638
Sioux Falls, SD 57101-2638
Telephone:  (605)357-2361
Facsimile:   (605)330-4410
E-Mail:        paige.petersen@usdoj.gov